FILED
2022 Jul-15  PM 12:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **TAMMY LYNN HILL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:20-cv-00892-MHH** |
| | } | |
| **NANCY BERRYHILL,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,**[1] | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Tammy Hill has asked the Court to review a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  The Commissioner denied Ms. Hill's applications for disability insurance benefits and supplemental security income based on an Administrative Law Judge's finding that she was not disabled.  Ms. Hill argues that the Administrative Law Judge–the ALJ–erred because the ALJ failed to account for the limitations caused by her fibromyalgia in assessing an RFC and because the ALJ's reasons for rejecting her testimony about her

---

[1] The Court asks the Clerk to please substitute Kilolo Kijakazi for Nancy Berryhill as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* FED. R. CIV. P. 25(d) (When a public officer leaves office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

limitations are not supported by substantial evidence.  After careful review, for the reasons stated below, the Court remands this case for further proceedings.

## LEGAL STANDARD FOR DISABILITY AND SSI

To succeed in her administrative proceedings, Ms. Hill had to prove that she was disabled.  *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013).  "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]  A claimant must prove that [she] is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a

───────────────────

[2]  Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program.  Title XVI of the Act governs applications for Supplemental Security Income or SSI.  "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited June 28, 2022).

residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

In 2018, Ms. Hill applied for supplemental security income and for disability insurance benefits. (Doc. 9-8, pp. 2, 7). Ms. Hill alleged that her disability began May 16, 2017. (Doc. 9-8, pp. 2, 7). The Commissioner denied Ms. Hill's claims on July 23, 2018. (Doc. 9-7, p. 2). Ms. Hill requested a hearing before an ALJ on September 4, 2018. (Doc. 9-7, p. 11). Ms. Hill appeared at the hearing on August 29, 2019. (Doc. 9-4, p. 4). The ALJ issued an unfavorable decision on October 21, 2019. (Doc. 9-3, p. 13). On April 30, 2020, the Appeals Council declined Ms. Hill's request for review (Doc. 9-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g) and 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

*Ms. Hill's Medical Records*

To support her applications, Ms. Hill submitted medical records that relate to diagnoses and treatment of anemia, osteoarthritis, polyarthritis, rheumatoid arthritis, depression, fibromyalgia, sleep apnea, tachycardia, neuropathy, vitamin deficiencies, dysautonomia, and migraine headaches. The Court has considered Ms. Hill's complete medical history with a focus on records that relate to Ms. Hill's complaints of pain and fatigue. The following records are most relevant to Ms. Hill's arguments before the Court.

*Dr. Lawrence Lee*

Dr. Lawrence Lee treated Ms. Hill from 2011 until 2018. Ms. Hill complained of fatigue at each visit with Dr. Lee, and she complained of pain at most visits. When she visited Dr. Lee in February 2011, Ms. Hill complained of tightness in her chest, difficulty breathing, fatigue, and heart palpitations. (Doc. 9-10, p. 18). Ms. Hill complained also of pain in her sternum. (Doc. 9-10, p. 18). Dr. Lee noted that Ms. Hill was taking vitamin B, Propranolol, Wellbutrin, Topamax, a multivitamin, and calcium, and she received an iron infusion every three months. (Doc. 9-10, p. 18). When Ms. Hill returned to Dr. Lee's office two weeks later, Dr. Lee indicated that Ms. Hill was a gastric bypass patient and that she had shortness of breath, chest pain, fatigue, and GERD. (Doc. 9-10, pp. 16-17). Dr. Lee instructed Ms. Hill to take Advair,

Singular, and omeprazole to treat her symptoms, and he scheduled her for a stress test and an echocardiogram.  (Doc. 9-10, p. 17).

On April 25, 2012, Ms. Hill visited Dr. Lee with complaints of fatigue, iron deficiency, migraine headaches, and vitamin D deficiency.  (Doc. 9-10, p. 11).  Ms. Hill reported no changes to her shortness of breath and chest pain.  (Doc. 9-10, p. 10). Dr. Lee indicated that Ms. Hill had experienced fatigue for years.  (Doc. 9-10, p. 10). Dr. Lee noted that Ms. Hill would see Dr. Burton for iron infusions and that she would return for a follow up in six months.  (Doc. 9-10, p. 11).

Ms. Hill saw Dr. Burton on July 17, 2012.  Ms. Hill indicated that she had begun to hurt all over, and she complained of chronic fatigue.  (Doc. 9-10, p. 8).  Dr. Burton stated that her complaints had arisen over many months.  (Doc. 9-10, p. 8).  Dr. Burton noted that Ms. Hill did not have anemia, but her test results indicated that she may have had an iron deficiency that had recurred or that her iron was insufficient over time. (Doc. 9-10, p. 8).  He noted also that Ms. Hill has "fibromyalgia-like symptoms and may have other reasons for new symptoms."  (Doc. 9-10, p. 8).  Dr. Burton noted that Ms. Hill would be tested for an autoimmune disorder and hemoglobin deficiency. (Doc. 9-10, p. 8).  Dr. Burton discussed his assessment and recommendations with Ms. Hill, and he sent a copy of his report to Dr. Lee.  (Doc. 9-10, pp. 8-9).  Ms. Hill continued to report to Dr. Lee that she felt fatigued despite the iron infusion she received from Dr. Burton.  (Doc. 9-10, pp. 3, 6-7).

Ms. Hill had an appointment with Dr. Lee in January of 2014. (Doc. 9-11, p. 5). Ms. Hill reported that she had had the flu for a week. (Doc. 9-11, pp. 5-6). Dr. Lee noted that Ms. Hill had chest pain, shortness of breath, fever, a productive cough, sore throat, fatigue, and weakness. (Doc. 9-11, p. 5). Dr. Lee treated only Ms. Hill's flu-like symptoms. (Doc. 9-11, p. 5). Ms. Hill returned to Dr. Lee's office on February 10, 2014. (Doc. 9-11, p. 3). Ms. Hill reported chest pain, shortness of breath, and fatigue. (Doc. 9-11, p. 3). Dr. Lee noted that Ms. Hill wanted to see a rheumatologist, and he made the referral. (Doc. 9-11, p. 3). Dr. Lee also noted that Ms. Hill had lupus, lower back pain, and joint pain. Dr. Lee asked Ms. Hill to return to the clinic in six months. (Doc. 9-11, p. 4).

On November 19, 2014, Dr. Lee noted that Ms. Hill had the "same fatigue issues." (Doc. 9-10, p. 119). Ms. Hill reported that the weekend before, she had become very weak and almost passed out. (Doc. 9-10, p. 119). Dr. Lee noted that Ms. Hill would be following up with a doctor for her iron infusions in December of 2014 and that she had increased pain in her lower back. (Doc. 9-10, pp. 119-120). Dr. Lee noted also that Ms. Hill had Sjogren's syndrome, but she refused the prescription to treat it. (Doc. 9-10, p. 119).[3] Dr. Lee asked Ms. Hill to return to the clinic in three months. (Doc. 9-10, p. 120).

---

[3] Sjogren syndrome is an immune system disorder characterized by dry eyes and dry mouth. With this disorder, the body's immune system attacks its own healthy cells that produce saliva and tears. Sjogren's often occurs with other autoimmune disorders, such as rheumatoid arthritis and lupus. The

Ms. Hill had an appointment with Dr. Lee on February 19, 2015. (Doc. 9-10, 117). Dr. Lee noted that Ms. Hill reported a lot of fatigue and pain in all her joints. (Doc. 9-10, p. 117). Dr. Lee noted also that Tramadol helped with Ms. Hill's "fibromyalgia pain." (Doc 9-10, p. 117). Dr. Lee wrote Ms. Hill prescriptions for Tramadol to treat her pain and Adderall to treat ADD. (Doc. 9-10, p. 118). Dr. Lee asked Ms. Hill to return for a follow-up visit in three months. (Doc. 9-10, p. 118).

Ms. Hill had a follow-up visit on May 19, 2015. (Doc. 9-10, p. 115). Dr. Lee reported that Tramadol helped with Ms. Hill's fibromyalgia pain and that Adderall "really helped with [Ms. Hill's] fatigue." (Doc. 9-10, p. 115). Later that year, Ms. Hill indicated that Tramadol eased her pain, but she still struggled with fatigue. (Doc. 9-10, pp. 110, 112).

Ms. Hill's fatigue and pain continued into 2016. (Doc. 9-10, p. 108). At her August 23, 2016 appointment, Dr. Lee noted that Ms. Hill had passed out three times and that she was still very tired and in a lot of pain. (Doc. 9-10, p. 108). Dr. Lee indicated that Ms. Hill had sought treatment with two rheumatologists. (Doc. 9-10, p. 108). Dr. Lee noted that Ms. Hill had tried Plaquenil for treatment, but she discontinued the medication on her own. (Doc. 9-10, p. 108).[4]

_____

main symptoms are dry mouth and dry eyes. https://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/symptoms-causes/syc-20353216 (last visited June 28, 2022).

[4] Plaquenil is used to treat "Sjogren's syndrome, rheumatoid arthritis, and lupus to relieve joint pain, fatigue, and rashes." https://nyulangone.org/conditions/sjogrens-syndrome-in-adults/treatments/medications-for-sjogren-s-syndrome (last visited June 28, 2022).

On August 26, 2016, Ms. Hill sought treatment at the Emergency Department at Shelby Baptist Medical Center. (Doc. 9-10, p. 49). Ms. Hill reported that her primary care physician, Dr. Lee, had referred her to the Emergency Department. (Doc. 9-10, p. 49). Ms. Hill reported that she was told that her iron saturation was 5. (Doc. 9-10, p. 49). Ms. Hill reported that she did not take iron supplements because she had an absorption problem because she had had a gastric bypass. (Doc. 9-10, p. 9). Dr. Dueffer treated Ms. Hill in the emergency department. (Doc. 9-10, p. 46). Dr. Dueffer indicated that Ms. Hill had a history of anemia and Sjogren syndrome. Dr. Dueffer noted that Ms. Hill had shortness of breath and that her iron was low. (Doc. 9-10, p. 49). Dr. Dueffer's report stated that Ms. Hill's other systems were normal. (Doc. 9-10, p. 49). Specifically, Dr. Dueffer noted that Ms. Hill was "oriented to person, place, and time" and that she "appear[ed] well-developed and well-nourished." (Doc. 9-10, p. 50). Ms. Hill had a normal range of motion and no tenderness or edema, and she had a normal mood, affect, behavior, and thought content. (Doc. 9-10, p. 50). At discharge, Dr. Dueffer instructed Ms. Hill to follow an iron rich diet and to follow up with Dr. Lee and Dr. Allendorp. (Doc. 9-10, pp. 61-62).

In December 2016, Ms. Hill reported many of the same symptoms to Dr. Lee. (Doc. 9-10, p. 98). Ms. Hill "ha[d] lots of fatigue" and was unable to sleep. (Doc. 9-10, p. 98). Dr. Lee noted that Ms. Hill did not have masses or tenderness in her abdomen, although she had joint pains, especially in her hands. (Doc. 9-10, pp. 98-

99).  Dr. Lee referred Ms. Hill to Dr. Unnoppet for a sleep study and for treatment of Sjogren's.  (Doc. 9-10, p. 99).

Ms. Hill had an appointment for a six-month check up with Dr. Lee on August 16, 2017.  Ms. Hill reported that she had lost her job and her insurance.  (Doc. 9-11, p. 78).  Ms. Hill reported falling and being unable to walk to the mailbox because of fatigue.  (Doc. 9-11, pp. 78-79).  She reported that she was bruised everywhere because of 20 falls.  She stated that pain medication provided little relief and that she could not do the things she used to do because of pain.  (Doc. 9-11, p. 78).  Dr. Lee noted that Ms. Hill had short term memory loss; he referred her for an MRI regarding MS lesions. (Doc. 9-11, p. 78).

In February 2018, Ms. Hill reported falling a lot, memory fog, fatigue, muscle pain, bilateral leg pain, "having to sit to do daily tasks at home[,] . . [and] constant dizz[iness]."  (Doc. 9-11, p. 69).  On August 27, 2018, Ms. Hill saw Dr. Lee.  For insurance purposes, Ms. Hill was listed as self-pay, and Dr. Lee noted that Ms. Hill was not able to do lab work and that she was trying to get on disability because she had lost everything.  (Doc. 9-13, p. 112).  Dr. Lee reviewed Ms. Hill's 17 medications and noted that Ms. Hill had idiopathic peripheral neuropathy, history of bypass of stomach, POTS, GERD, Cobalamin deficiency, Iron deficiency, Vitamin D deficiency, migraines, neuropathy, osteoarthritis, ADD, and fatigue.  For Ms. Hill's history of present illnesses, Dr. Lee wrote:

9

Ms. Hill reported that she was denied disability and is currently appealing her denial. Since she has been unemployed for quite sometime [*sic*], she has not had any medical insurance and had to stop most of her medicines. She was able to wean off of Wellbutrin and Cymbalta. She had to discontinue methotrexate, which subsequently resulted in increased joint pain and stiffness with recurrent mouth sores on the soft palate. Her last does [*sic*] of methotrexate was July 2018. She had been followed by Dr. Nop Unnoppet of rheumatology. Patient has been diagnosed with POTS syndrome [] and peripheral neuropathy. Patient also has had recurrent migraine headaches. Her Topamax has helped her at 100 mg a day, but due to cost, she dropped the strength to 50 mg daily, which is not as effective. . . . She was told by her disability physician that she may have CTD (Connective Tissue Disease) and needed to follow-up with a physician at UAB. The patient asked me to sign a form that was [*sic*] assist her into the charity medical clinic at UAB with hopes she could be referred to another rheumatologist to be further evaluated for her CTD. She requested that her Topamax, Inderal, and tramadol be renewed. Patient states she has lots of pain in all her joints and no OTC analgesic has helped ease the pain.

(Doc. 9-13, p. 114). Dr. Lee completed the form to refer Ms. Hill to the charity clinic at UAB and renewed her pain medication prescriptions. (Doc. 9-13, p. 115).

*Alabama Oncology*

Ms. Hill received iron infusions for anemia at Alabama Oncology from 2013-2018. (Doc. 9-10, p. 152; Doc. 9-11, p. 66). On June 27, 2013, Ms. Hill had an appointment with Dr. Susan Ferguson. (Doc. 9-10, p. 152). Ms. Hill complained of body pains and migraine headaches. (Doc. 9-10, p. 152). She reported that she could sleep only three or four hours each day. (Doc. 9-10, p. 152). Dr. Ferguson reported that Ms. Hill's heart had a regular rate and rhythm, and her bloodwork showed "an excellent reticulocytotic and [that] her hemoglobin was up to 12.5." (Doc. 9-10, p.

152).[5]  Dr. Ferguson recommended that Ms. Hill "try to get more rest."  (Doc. 9-10, p. 152).  On December 12, 2013, Ms. Hill visited Dr. Ferguson at Alabama Oncology. Ms. Hill reported that she was doing "fairly well."  Dr. Ferguson noted that Ms. Hill's last iron infusion helped with her energy level, and it helped her feel better.  (Doc. 9-11, p. 2).  Dr. Ferguson noted that she would let Ms. Hill know whether she needed another INFeD infusion.[6]

On August 30, 2016, Ms. Hill saw Dr. Daniel Allendorf at Alabama Oncology. (Doc. 9-10, p. 105).  Dr. Allendorf noted that Ms. Hill had a history of iron deficiency and that she was "chronically fatigued."  (Doc. 9-10, p. 105).  Dr. Allendorf noted also that Ms. Hill last received an infusion in May 2015.  (Doc. 9-10, p. 105).  Ms. Hill's cardiovascular, musculoskeletal, and psychiatric systems were normal.  (Doc 9-10, p. 106).  Dr. Allendorf indicated that Ms. Hill had a normal range of motion in her neck, that her abdomen was not tender, and that she had no edema.  (Doc. 9-10, p. 106).  Ms. Hill missed an appointment with Dr. Allendorf in November 2016.  (Doc. 9-10, p. 146).

On May 30, 2017, Ms. Hill saw Dr. Allendorf.  Dr. Allendorf noted that Ms. Hill was last seen in the clinic in 2016, but she had recently complained to her primary care

---

[5] "Reticulocytosis is an elevation in the number of reticulocytes (young red blood cells) in blood, a sign of unusually rapid red blood cell production. The number of reticulocytes is normally less than 1% of the total number of the red blood cells." https://www.rxlist.com/reticulocytosis/definition.htm (last visited on June 28, 2022).

[6] INFed is "used to treat 'iron poor' blood (anemia) in people who cannot take iron by mouth because of side effects or because their anemia has not been successfully treated by it." https://www.webmd.com/drugs/2/drug-13878/infed-injection/details (last visited July 11, 2022).

physician that she had "fatigue, general weakness, and muscle aches" that had become worse over the preceding two months. (Doc. 9-10, p. 16). Dr. Allendorf indicated that Ms. Hill's Ferritin was low; he referred her for an iron infusion. (Doc. 9-10, p. 146).

On August 29, 2017, Dr. Allendorf noted that Ms. Hill complained of "worsening fatigue to the point that she ha[d] lost her job." (Doc 9-10, p. 143). Dr. Allendorf found that Ms. Hill's systems were normal, and he noted that she had a normal range of motion in her neck, a non-tender abdomen, and a lack of edema. (Doc 9-10, p. 144). Dr. Allendorf indicated that Ms. Hill had difficulty with her iron infusion after her last appointment. (Doc. 9-10, p. 143). On November 28, 2017, Ms. Hill saw Dr. Allendorf again. (Doc. 9-10, p. 138). Dr. Allendorf noted that Ms. Hill complained of "ongoing fatigue despite correction of iron stores and normal Hgb." (Doc. 9-10, p. 138). Ms. Hill reported that she was being evaluated for MS. Dr. Allendorf noted that Ms. Hill had received her last infusion of iron in September of 2017. (Doc. 9-10, p. 138). Dr. Allendorf opined that because Ms. Hill continued to experience fatigue despite the correction of her iron deficits, her symptoms might not be related to iron or anemia. (Doc. 9-10, p. 140). Dr. Allendorf noted that he planned to repeat Ms. Hill's iron and B12 studies in three months. (Doc. 9-10, p. 140).

In February 2018, Dr. Allendorf reported that Ms. Hill had "ongoing fatigue, dyspnea, and generalized weakness independent of her hemoglobin and independent of her iron stores," (Doc 9-11, p. 66), and he opined: "Considering how symptomatic she is regardless of hemoglobin level and iron studies, I suspect that her fatigue and

other symptoms are unrelated to her iron/B12 status," (Doc. 9-11, p. 68).  During this visit, Dr. Allendorf noted that Ms. Hill had a normal range of motion in her neck, non-tenderness in her abdomen, and no edema.  (Doc. 9-11, pp. 67-68).

*Dr. Nopporn Unnoppet*

On December 22, 2016, Dr. Nopporn Unnoppet, a rheumatologist at Brookwood Baptist Health, assessed Ms. Hill and found that she had chronic fibromyalgia, chronic obstructive sleep apnea, and chronic polyarthritis.  (Doc. 9-12, pp. 25-27).  Dr. Unnoppet noted that Ms. Hill reported moderate symptoms that occur daily.  (Doc. 9-12, p. 25).  Dr. Unnoppet noted that Ms. Hill had abdominal pain, an irregular heartbeat, cough, dyspnea, wheezing, eye discharge and vision loss, hearing loss, and lethargy. (Doc. 9-12, p. 26).  Dr. Unnoppet's physical exam yielded normal results except that Ms. Hill had "[m]ultiple tender points consistent with fibromyalgia."  (Doc. 9-12, p. 26).

On January 12, 2017, Ms. Hill returned to see Dr. Unnoppet.  (Doc. 9-12, p. 30). Dr. Unnoppet noted that he "[s]uspect[ed]" that Ms. Hill was "dealing with fibromyalgia."  (Doc. 9-12, p. 30).  Ms. Hill had bone and joint symptoms, rheumatologic manifestations, abdominal pain, and lethargy.  (Doc. 9-12, p. 32).  From a visual overview, Ms. Hill's four extremities appeared normal.  (Doc. 9-12, p. 32). Dr. Unnoppet asked Ms. Hill to continue taking "meloxicam 7.5 milligrams twice a

day" and "to add Neurontin 300 milligrams twice a day to her regimen." (Doc. 9-12, p. 30). Ms. Hill received a Toradol shot. (Doc. 9-12, p. 30).

During her February 14, 2017 visit with Dr. Unnoppet, Ms. Hill reported swelling in her joints. (Doc. 9-12, p. 35). Dr. Unnoppet stated that he would try Ms. Hill on "Plaquenil for possible inflammatory arthritis." (Doc. 9-12, p. 35). Dr. Unnoppet asked Ms. Hill to follow up in six weeks. (Doc. 9-12, p. 35).

On March 28, 2017, Dr. Unnoppet again reported that he had "a concern for inflammatory arthritis" and noted that Ms. Hill had "[p]rimary osteoarthritis involving multiple joints." (Doc. 9-12, pp. 40, 42). Dr. Unnoppet explained that Ms. Hill took Plaquenil for six weeks, and she did not improve. (Doc. 9-12, p. 40). Dr. Unnoppet reported that Ms. Hill's biggest complaints were fatigue and hand pain. (Doc. 9-12, p. 40). Dr. Unnoppet prescribed Norco for Ms. Hill "to see if [it would] help with her discomfort." (Doc. 9-12, p. 40). He asked her to return in three weeks. (Doc. 9-12, p. 40).

When Ms. Hill returned to Dr. Unnoppet in April 2017, she reported pain relief with Norco. (Doc. 9-12, p. 45). Dr. Unnoppet noted that Ms. Hill experienced visual disturbances, chronic fatigue, and weakness in her legs. (Doc. 9-12, p. 45). Ms. Hill also reported joint pain, back pain, bone and joint symptoms, muscle weakness, rheumatologic manifestations, chest pain, generalized weakness, and lethargy. (Doc. 9-12, p. 46). Ms. Hill had tenderness in her hands and knees. (Doc. 9-12, p. 47). Dr. Unnoppet planned a follow up visit in two months. (Doc. 9-12, p. 45).

When Ms. Hill saw Dr. Unnoppet on August 31, 2017, Dr. Unnoppet noted that Ms. Hill had a history of polyarthritis, and what he thought was fibromyalgia. (Doc. 9-12, p. 49). Ms. Hill reported "tender points all over." (Doc. 9-12, p. 49). Dr. Unnoppet noted that Ms. Hill had stopped taking most of her medications because she had lost her job. (Doc. 9-12, p. 49). Dr. Unnoppet determined that Ms. Hill had chronic fibromyalgia and had fair control over her primary osteoarthritis involving multiple joints. (Doc. 9-12, p. 51). Dr. Unnoppet gave Ms. Hill a shot of Toradol and asked her to come back for a follow up in three weeks. (Doc. 9-12, p. 5).

At her visit with Dr. Unnoppet on September 21, 2017, Ms. Hill complained of fatigue and tenderness that worsened with use of her knees, hips, and shoulders. (Doc. 9-12, p. 53). Dr. Unnoppet noted that Ms. Hill's MRI for multiple sclerosis was negative. (Doc. 9-12, p. 53). Dr. Unnoppet noted that Ms. Hill had fair control over her fibromyalgia at the visit. (Doc. 9-12, p. 56).

Dr. Unnoppet notated Ms. Hill's fibromyalgia from October 2017 to April 2018. (Doc. 9-11, p. 61; Doc. 9-12, pp. 66, 71, 76-77). In November 2017, Dr. Unnoppet observed that Ms. Hill had tenderness in her left and right hands, hips, feet, and ankles. (Doc. 9-12, p. 66).

In August 2018, Dr. Unnoppet noted that Ms. Hill was not working because of her diffuse pain with polyarthritis. (Doc. 9-14, p. 60). Dr. Unnoppet noted also that "[s]ince [Ms. Hill] ha[d] not been working she does not have the financial support to get her medications." (Doc. 9-14, p. 60). Dr. Unnoppet explained:

She realizes that when she was on methotrexate it did give her some improvement but she is unable to continue this because she would need bloodwork every three months and without insurance she would be unable to get blood drawn. She's trying to get into the free clinic at the University which I think this would be a good choice.

In regards to her inflammatory arthritis, I suspect we are dealing with seronegative rheumatoid arthritis or an overlap syndrome. Her fibromyalgia also is not stable in since her finances have been lost she now is back on gluten which makes her very sick.

(Doc. 9-14, p. 60). Dr. Unnoppet opined that Ms. Hill had "greater than 11 out of 18 tender points consistent with fibromyalgia." (Doc. 9-14, p. 61). Dr. Unnoppet indicated that Ms. Hill did not have deformities in her hands, she had a normal range of motion in her wrists, and she had tenderness in her shoulders. (Doc. 9-14, p. 61).

*Other Medical Opinions*

Ms. Hill sought treatment from several other doctors during the relevant time period. In January of 2017, Dr. Sunil Goli opined that Ms. Hill had fatigue, hypersomnia, and restless leg syndrome. (Doc 9-10, pp. 129-30). During that visit, Dr. Goli indicated that Ms. Hill had a 5/5 motor power on her extremities, had a normal gait, and had no edema. (Doc. 9-10, p. 96). In April 2017, Dr. Goli noted that Ms. Hill had hypersomnia, fatigue, restless legs syndrome, and memory impairment. (Doc 9-10, pp. 126-27). Ms. Hill's motor exam showed 5/5 strength of her extremities, her gait was normal, and she did not have edema. (Doc. 9-10, p. 126).

In September 2017, Don Thrower, CRNP, reported that Ms. Hill had joint pain, but she did not have back pain, bone or joint symptoms, muscle weakness,

rheumatologic manifestations, or abdominal pain.  (Doc. 9-11, pp. 97, 99).  Nurse Thrower indicated that Ms. Hill had chronic primary osteoarthritis involving multiple joints and fairly-controlled fibromyalgia.  (Doc. 9-11, p. 100).  In November 2017, Nurse Thrower reported that Ms. Hill was positive for other malaise and fatigue, joint pain, and myalgia.  (Doc. 9-11, pp. 88-90).  Nurse Thrower indicated that Ms. Hill had chronic rheumatoid arthritis, primary osteoarthritis involving multiple joints, controlled fibromyalgia, and chronic muscle weakness in her upper extremities.  (Doc. 9-11, p. 90).

In January 2018, on a referral from Dr. Unnoppet, Ms. Hill visited Dr. Diana Counce at Neurology and Neurodiagnostics of Alabama for complaints of "pain all over," "right wrist numbness," and weakness that led to stumbling, falling, and dropping items.  (Doc. 9-12, p. 6).  Dr. Counce evaluated Ms. Hill for neuromuscular junction defect and found that Ms. Hill had no limitations and no defects.  (Doc. 9-12, p. 6).  Dr. Counce concluded that Ms. Hill did not show signs of Myasthenia Gravis but recommended additional testing.  (Doc. 9-12, p. 6).  Dr. Counce determined that Ms. Hill had a Vitamin B12 and Vitamin D deficiency and memory deficits.  (Doc. 9-12, p. 8).

Ms. Hill had an appointment with Dr. Susan Phillips at the Dysautonomia MVP Center in March 2018 by referral from Dr. Counce.  (Doc. 9-11, p. 124).  Ms. Hill's complaints included dizziness, fatigue, orthostatic hypotension, and palpitations.  (Doc. 9-11, p. 124).  Dr. Phillips noted that Ms. Hill had been "treated for Rheumatoid

Arthritis and Osteoarthritis despite the fact that her markers have always been negative." (Doc. 9-11, p. 125). Dr. Phillips performed a physical exam, a tilt table test, an echocardiogram, and a graded exercise test or GXT. (Doc. 9-11, pp. 126-27). Dr. Phillips noted that Ms. Hill had normal gait, station, and strength. (Doc. 9-11, p. 126). Dr. Phillips concluded that "[Ms.] Hill ha[d] multiple symptoms with an underlying dysautonomia." (Doc. 9-11, p. 126). Dr. Phillips gave Ms. Hill the following diagnoses: palpitations; precordial pain; dizziness; tachycardia, unspecified; proximal tachycardia, unspecified; orthostatic hypotension; dyspnea, unspecified; restless leg syndrome; myalgia; obstructive sleep apnea; irritable bowel syndrome; migraine; general anxiety disorder; and primary insomnia. (Doc. 9-11, p. 126).

In April 2018, Dr. Phillips evaluated Ms. Hill again, noting that Ms. Hill had a normal gait, no edema, normal strength, and normal motor functions. (Doc. 9-11, p. 122). Dr. Phillips reported that Ms. Hill was depressed and suffered from panic attacks, but Ms. Hill could not afford to see a psychiatrist. (Doc. 9-11, p. 123). In August 2018, Dr. Phillips found that Ms. Hill was mildly depressed and that she had "a lot more pain" because she stopped taking most of her medicine due to her lack of insurance. (Doc. 9-14, pp. 45, 47). At each appointment, Dr. Phillips opined that Ms. Hill had orthostatic hypotension, POTS, and fatigue. (Doc. 9-11, p. 126; Doc. 9-14, pp. 47, 50).

In June 2018, Ms. Hill visited Dr. Borlaza with MDSI Physicians Services for a functional assessment. (Doc. 9-13, pp. 69-70). Dr. Borlaza observed that Ms. Hill could "clean laundry, do dishes and cook" but only while she was sitting in a chair.

(Doc. 9-13, p. 69).  Ms. Hill reported that she could make her bed, dress herself, and feed herself, but she required a shower chair to bathe.  (Doc. 9-13, p. 69).  Ms. Hill reported that her sister and her neighbors helped her complete other chores like yard work.  (Doc. 9-13, p. 69).  On the day of the appointment, Ms. Hill informed Dr. Borlaza that she was "having a good day" and did not have an arthritis flare or tender fibromyalgia points during the exam.  (Doc. 9-13, p. 72).  Dr. Borlaza observed that "[t]here [was] no evidence of localized tenderness[,]" but Ms. Hill had some unsteadiness when performing her toe/heel testing, and she was unable to do hop testing.  (Doc. 9-13, p. 71).  Ms. Hill had 4/5 muscle strength on her hips and knees; otherwise, she had 5/5 strength in her "bilateral upper and lower extremities."  (Doc. 9-13, p. 72).  Based on his visit with Ms. Hill, Dr. Borlaza diagnosed her with dysautonomia/POTS and sero-negative arthritis.  (Doc. 9-13, p. 73).

According to Dr. Borlaza, Ms. Hill's use of a cane and a knee-brace were only medically necessary when Ms. Hill had "flares" because her "[a]mbulation without the device was normal."  (Doc. 9-13, p. 73).  He concluded that Ms. Hill's maximum standing and walking capacity was four to six hours, but Ms. Hill did not have a limitation on her sitting capacity.  (Doc. 9-13, p. 73).  Dr. Borlaza restricted Ms. Hill's lifting, carrying, pushing, and pulling capacity to twenty-five pounds frequently and fifty pounds occasionally.  (Doc. 9-13, p. 73).  Ms. Hill's ability to perform actions such as crouching, reaching, handling, and crawling were without limitation, but Dr. Borlaza observed that Ms. Hill should only climb stairs, ladders, or stoops occasionally.

(Doc. 9-13, p. 73).  Dr. Borlaza explained that these limitations were "due to weakness of right hip flexion and bilateral knee extension, decreased range of motion of the lumbar spine and hips bilaterally as well as history of dysautonomia[,] POTS and fibromyalgia."  (Doc. 9-13, p. 74).

In September 2018, Dr. John Waits found that Ms. Hill had a "[v]ery extensive rheumatology [history]" but noted that Ms. Hill had trouble getting an exact diagnosis because she had "been told it was maybe lupus, [S]jogren's, POTS, dysautonomia, [fibromyalgia], [or] MCTD."  (Doc. 9-15, p. 50).  Dr. Waits noted that Ms. Hill's movement of her joints, bones, and muscle extremities was normal, and she had a normal gait.  (Doc. 9-15, p. 51).  Dr. Waits explained that Ms. Hill could not afford most of her medications or treatment from specialists; Dr. Waits sent Ms. Hill to a community food bank.  (Doc. 9-15, pp. 50-51).  Dr. Waits diagnosed several autonomic nervous system disorders, migraines, depressive disorder, and fibromyalgia.  (Doc. 9-15, p. 51).

In February 2019, Dr. Marc Collins of the Rheumatology Department at UAB found that Ms. Hill had "a constellation of symptoms, including profound fatigue and generalized weakness[,] which [were] the most difficult for her."  (Doc. 9-15, p. 85).  Dr. Collins noted that Ms. Hill "endorse[d] chronic joint pains in her PIPs, knees, hips (lateral and groin), shoulders, and neck [] that occur[ed] daily."  (Doc. 9-15, p. 85).  Dr. Collins indicated that there was no evidence of joint inflammation or rheumatoid arthritis.  (Doc. 9-15, p. 85).  Dr. Collins diagnosed Ms. Hill with an

20

"immunodeficiency related autoimmunity" and a combination of osteoarthritis and fibromyalgia.  (Doc. 9-15, p. 85).

Ms. Hill had an appointment with rheumatologist Dr. Matthew Mullen in June of 2019.  (Doc. 9-15, p. 100).  At the visit, Dr. Mullen diagnosed Ms. Hill with seronegative rheumatoid arthritis of multiple sites, osteoarthritis of multiple sites, fatigue, and Sicca syndrome.  (Doc. 9-15, pp. 102-03).[7]  Dr. Mullen also noted that Ms. Hill had tenderness in both wrists.  (Doc. 9-15, p. 102).

In July 2019, Ms. Hill visited Dr. Jamie Bishop at Cahaba Medical.  Dr. Bishop noted that Ms. Hill had spinal tenderness that was more severe on her left side than her right.  (Doc. 9-16, p. 45).  Ms. Hill also had bilateral pain in her hands, neck, and lower back.  (Doc. 9-16, p. 46).  Dr. Bishop treated Ms. Hill with an osteopathic manual medicine ("OMM") procedure.  (Doc. 9-16, p. 45).  The OMM procedures provided Ms. Hill with cervical treatments, thoracic treatments, lumbar spine treatments, and lower extremity treatments.  (Doc. 9-16, p. 45).

*Ms. Hill's Disability Application: Function Report*

Ms. Hill completed her disability application function report on May 1, 2018. (Doc. 9-9, p. 38).  Ms. Hill indicated that it took twenty minutes to get out of bed each morning.  (Doc. 9-9, p. 22).  Ms. Hill explained that her "[e]very movement need[ed]

---

[7] Sicca syndrome is "an autoimmune disease, also known as Sjogren syndrome." https://www.medicinenet.com/sicca_syndrome/definition.htm (last visited July 11, 2022).

to be calculated in order to maximize [the] usage of energy." (Doc. 9-9, p. 22). Ms. Hill indicated that she would need an hour to feed her pets and get to the mailbox, and she had to take many rest breaks to do regular household tasks, such as wash clothes or dishes. (Doc. 9-9, p. 22). Ms. Hill stated that she was able to feed her pets, but she was unable to take them on walks. (Doc. 9-9, p. 23). Ms. Hill wrote that she needed help from her sister to care for the animals "on the bad days" because she was unable to move because of her stiffness, pain, or fatigue. (Doc. 9-9, p. 23).

Ms. Hill indicated that she did not have a problem with rest, but she had to use a shower chair because she could not stand for very long. (Doc. 9-9, p. 23). Ms. Hill struggled to blow dry and comb her hair because her arms fatigued rapidly, and her hands began to hurt. (Doc. 9-9, p. 23). Ms. Hill did not have a problem feeding herself or using the toilet, but she had to switch to an electronic toothbrush. (Doc. 9-9, p. 23).

Ms. Hill reported that "what used to take maybe [two] hours now [took] a week." (Doc. 9-9, p. 24). Ms. Hill pays another person to care for her lawn. (Doc. 9-9, p. 24). Ms. Hill wrote that, even on good days, she was always dizzy and lightheaded. (Doc. 9-9, p. 25). And after walking to the mailbox her legs would hurt so badly and she was so fatigued that she had to sit down in the driveway to have the energy to walk back to the house. (Doc. 9-9, p. 25). Ms. Hill explained that she no longer attended church and that she lost her job. (Doc. 9-9, p. 26). Ms. Hill indicated that she did not need to be reminded to go places, but she did not go places often because it took everything out of her, and she was unable to walk far. (Doc. 9-9, p. 26). Ms. Hill wrote that once

she was sick for two days from the exhaustion of attending a family picnic.  (Doc. 9-9, p. 26).  Regarding social interaction, Ms. Hill indicated that her friends came to visit her at home, or she communicated with them via text message or Facebook.  (Doc. 9-9, p. 26).

Ms. Hill wrote that she could not lift much more than 20 pounds and that required both of her hands; her stiffness and fibromyalgia prevented her from reaching and bending; her POTS reduced her ability to stand; she became out of breath and was in pain when she used the stairs; her sight was blurry due to her Sjogren's disease; her hands cramped and felt stiff, which caused her to drop items constantly; she used different splints or braces when one of her joints was "acting up" or weak; and she used one splint or brace for her knee, wrist, ankle, or back during a "flare" of a particular joint.  (Doc. 9-9, pp. 27-28).

*Ms. Hill's Administrative Hearing*

On August 29, 2019, Ms. Hill testified at an administrative hearing.  (Doc. 9-4, p. 4).  Ms. Hill testified that she lived with her sister, who she depended on for financial support.  (Doc. 9-4, p. 5).  Ms. Hill testified that she "relied on [her] sister to take care [of her]."  (Doc. 9-4, pp. 6, 14).  Ms. Hill explained that her sister had to comb her hair, take out her dog, and take over as their father's primary caregiver three years ago when Ms. Hill's physical issues started.  (Doc. 9-4, p. 14).

Ms. Hill testified that a cluster of problems associated with POTS and dysautonomia kept her from leaving the house and working. (Doc. 9-4, pp. 15-16). Ms. Hill testified that she could not stand, sit, control her body, control her heart rate, or control her temperature. (Doc. 9-4, p. 15). Ms. Hill testified that her doctors diagnosed her with fibromyalgia, seronegative rheumatoid arthritis, and osteoarthritis. (Doc. 9-4, p. 19). Although it was not prescribed, Ms. Hill used a cane on "days that [her] neuropathy [was] bad." (Doc. 9-4, p. 16). According to Ms. Hill, her doctors instructed her not to stand longer than ten minutes, not to lift more than 20-25 pounds, and to sit for "no longer 30 minutes at a time." (Doc. 9-4, pp. 8-10). Ms. Hill noted that she used a shower chair to bathe and often fell due to weakness. (Doc. 9-4, p. 14).

Ms. Hill testified that she was always in pain and that she typically rested three to five hours each day. (Doc. 9-4, p. 20). Ms. Hill stated that one reason she lied down was to prevent blood from pooling in her legs. (Doc. 9-4, pp. 20-21). Ms. Hill explained that her doctors directed her to elevate her legs above her heart to keep the swelling down. (Doc. 9-4, p. 20). Ms. Hill testified that one doctor instructed her to wear compression hose to keep the blood out of her legs. (Doc. 9-4, pp. 9, 21).

Ms. Hill testified that she took prescribed medications, and she received "OMM" treatment, or osteopathic manual medicine, every six to eight weeks. (Doc. 9-4, pp. 7-8, 19). Ms. Hill explained that osteopathic treatment involved manipulating her neck, shoulders, back, legs, and hips and applying pressure to certain pressure points. (Doc. 9-4, p. 18). Ms. Hill stated that her doctor performed this treatment for her

fibromyalgia on twelve pressure points.  (Doc. 9-4, p. 18).  Although the OMM doctor suggested that Ms. Hill receive physical therapy, Ms. Hill stated that she was unable to pay for the therapy due to her lack of insurance.  (Doc. 9-4, p. 8).

Ms. Hill was the first in her family to attend college, and she took pride in working.  (Doc. 9-4, p. 14).  Thus, Ms. Hill stated that "not being able to work and not being able to take care of [herself] ha[d] been a major disruption in [her] life."  (Doc. 9-4, p. 14).  Ms. Hill felt like she had "no quality of life."  (Doc. 9-4, p. 14).  Ms. Hill stated that she had become depressed and suicidal.  (Doc. 9-4, pp. 20-21).  Thus, Ms. Hill was seeing a counselor at Cahaba Medical.  (Doc. 9-4, p. 12).  Ms. Hill explained that her depression changed her personality, and, although she used to be a "people person," her mental health caused her to become withdrawn.  (Doc. 9-4, p. 22).

When Ms. Hill lost her job and insurance, she had to change doctors.  (Doc. 9-4, p. 17).  Ms. Hill acknowledged that her medical records were non-consecutive due to her "separated" doctor visits.  (Doc. 9-4, p. 17).  Ms. Hill explained that the disruption in the records was due to her loss of insurance.  (Doc. 9-4, p. 17).  She noted that she had not seen a doctor in two years before the hearing, although she was seeing a nurse practitioner.  (Doc. 9-4, p. 17).

Ms. Hill testified that she worked as a pharmacy technician at several different places until May 15, 2017.  (Doc. 9-4, pp. 5, 15).  In this position, Ms. Hill read and filed prescriptions, and she served as a supervisor over a medication reconciliation department.  (Doc. 9-4, p. 22; Doc. 9-5, p. 2).  In the medication reconciliation

department, Ms. Hill supervised "over 100 people at a Fortune 500 company," working to provide "telemedicine and pharmacy tech [to] prisons and prisoners." (Doc. 9-4, p. 22). The medication reconciliation department worked with nurses and doctor at prisons to ensure prisoners had required medication. (Doc. 9-5, p. 3).

Mr. James Hare testified as the vocational expert—the VE—at the administrative hearing. (Doc. 9-5, p. 4). Mr. Hare noted that Ms. Hill's previous work consisted of "hybrid" work. (Doc. 9-5, p. 5). Based on Ms. Hill's work as a pharmacy technician, Mr. Hare concluded that "the best title [he] could find that fits with the description . . . [was] a packaging supervisor." (Doc. 9-5, p. 6). Mr. Hare concluded that Ms. Hill's work in the medication reconciliation department was equivalent to an adjustment clerk. (Doc. 9-5, p. 6). Mr. Hare described Ms. Hill's prior roles as "a composite job: pharmacy tech and packaging supervisor; composite job: pharmacy tech and adjustment clerk." (Doc. 9-5, p. 6).

Mr. Hare determined that Ms. Hill's past work as a pharmacy tech and packaging supervisor were light level jobs. (Doc. 9-5, p. 7). Mr. Hare concluded that a hypothetical person with Ms. Hill's age, education, past work experience, and limitations who could perform light exertional work could not perform any of the composite jobs described from Ms. Hill's work history. (Doc. 9-5, p. 9). Mr. Hare found that jobs existed in the national economy for an individual of Ms. Hill's ability, age, education, work experience, and limitations, including production assembler and laundry sorter. (Doc. 9-5, p. 9).

26

### THE ALJ'S DECISION

Following the hearing, the ALJ determined that Ms. Hill had not engaged in substantial gainful activity since May 16, 2017, the alleged onset date. (Doc. 9-3, p. 18). The ALJ determined that Ms. Hill suffered from the severe impairments of Vitamin D deficiency, rheumatoid arthritis, osteoarthritis, dysautonomia, orthostatic hypotension, inflammatory bowel disease, Sjogren's syndrome, anxiety, and depression. (Doc. 9-3, p. 18). The ALJ determined that Ms. Hill had nine non-severe impairments, none of which was fibromyalgia. (Doc. 9-3, pp. 18, 19).[8] Based on a review of the medical evidence, the ALJ concluded that Ms. Hill did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 9-3, p. 21).

Considering Ms. Hill's impairments, the ALJ evaluated Ms. Hill's residual functional capacity. The ALJ determined that Ms. Hill had the RFC to perform:

> light work . . .except she cannot climb ladders, ropes, or scaffolds; she cannot perform around hazards; she can frequently climb ramps and stairs; and she can frequently balance, stoop, kneel, crouch, or crawl. The claimant has option to change posture from upright to seated, or vice versa, at her discretion, approximately every 30 minutes. She cannot perform work in concentrated exposure to environments of extreme hot or cold temperatures, humidity, vibration, fumes, odors, dust, gasses, and poor ventilation. She would need access to restroom facilities. The claimant can understand, remember, and carry out short and simple instructions. She can carry out simple tasks for two-hour periods during a normal workday with customary breaks. Interactions with other should

---

[8] Ms. Hill's medical records confirm that she is obese.

be no more than occasional and no more than 30 minutes at one time. She would need assistance with setting realistic goals and making plans. Any changes in the workplace or setting should be no more than occasional and gradually introduced.

(Doc. 9-3, p. 27). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). "If someone can do light work, . . . he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

Based on this RFC, the ALJ concluded that Ms. Hill was not able to perform her past relevant work as a packing supervisor, pharmacy technician, or adjustment clerk. (Doc. 9-3, p. 36). Relying on testimony from the VE, the ALJ found that jobs existed in the national economy that Ms. Hill could perform, including bench assembler, garment sorter, and production assembler. (Doc. 9-3, pp. 37-38). Accordingly, the

ALJ determined that Ms. Hill was not disabled within the meaning of the Social Security Act. (Doc. 9-3, p. 38).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If a district court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Ms. Hill argues that she is entitled to relief from the ALJ's decision because the ALJ failed to account for limitations caused by fibromyalgia when assigning an RFC. (Doc. 11, p. 11). Ms. Hill also argues that the ALJ did not properly consider her testimony and that the ALJ's credibility determinations are not supported by substantial evidence. (Doc. 11, p. 18). Because the Court finds error in Ms. Hill's RFC, the Court will not consider Ms. Hill's credibility arguments.

Under 20 C.F.R. § 404.1512(a), a claimant must establish that he or she is disabled. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The Commissioner "must properly consider the person's symptoms" when determining whether the person has a medically-determined impairment of fibromyalgia. SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012). When assessing a person's RFC, the Commissioner must evaluate the "effects of all of the person's medically determinable impairments, including impairments that are 'not severe.'" SSR 12-2p, 2012 WL 3104869, at *6 (July 25, 2012).

Social Security Ruling (SSR) 12-2p "provides guidance on how [to] develop evidence to establish that a person has a medically determinable impairment of fibromyalgia." SSR 12-2p, 2012 WL 3104869, at *1 (July 25, 2012). Under this listing, a claimant must demonstrate that he or she has a history of "pain in all quadrants of the body" and has "at least [eleven] positive tender points" found both bilaterally as well as above and below the waist and must present "evidence that other disorders that could cause the symptoms . . . were excluded." SSR 12-2p, 2012 WL 3104869, at *2-3.

Here, the ALJ acknowledged references to fibromyalgia in Ms. Hill's medical records but did not count fibromyalgia as a severe impairment, citing the absence of specific findings required to satisfy the requirements of SSR 12-2p. (Doc. 9-3, p. 19). The ALJ stated that Ms. Hill's "record does not confirm that [Ms. Hill] has the requisite number of tender point findings (or any tender points) and there is no evidence that medical doctors have excluded other impairments as required in Social Security Ruling 12-2p." (Doc. 9-3, p. 19). On appeal, the Commissioner concedes that "the record does show evidence of tender points, so the ALJ made a misstatement about the complete absence of tender points," (Doc. 12, p. 8), but the Commissioner argues that the ALJ's misstatement was "harmless given that the ALJ correctly found no MDI of fibromyalgia due to the . . . lack of evidence that doctors excluded other impairments that could have caused [the] symptoms." (Doc. 12, p. 8). But the record demonstrates that Ms. Hill's doctors did exclude other impairments.

31

As early as 2012, Ms. Hill's medical records contain findings regarding fibromyalgia. (Doc. 9-10, p. 8). In 2015, Dr. Lee noted several times that Tramadol helped Ms. Hill's fibromyalgia. (Doc 9-10, p. 117). On April 26, 2018, Dr. Unnoppet noted that Ms. Hill had bilateral tenderness on her shoulders, bilateral tenderness on her hips, and bilateral tenderness on her knees. (Doc. 9-12, p. 76). On August 29, 2018, Dr. Unnoppet observed that Ms. Hill has "greater than 11 of 18 tender points consistent with fibromyalgia." (Doc. 9-14, p. 61). These findings establish a history of "pain in all quadrants of the body" and "at least [eleven] positive tender points" found both bilaterally as well as above and below the waist. The following doctors provided a fibromyalgia diagnosis for Ms. Hill: Dr. Unnoppet, a rheumatologist at Brookwood Baptist Health, (Doc. 9-12, pp. 25-27, 51); Dr. Marc Collins of the Rheumatology Department at UAB, (Doc. 9-15, p. 85), and Dr. John Waits of Cahaba Medical Care, (Doc. 9-15, p. 51). *See Jiles v. Astrue*, 2008 WL 2225780, *4 (S.D. Ala. May 23, 2008) (ALJ explaining that a rheumatologist has a "medical specialty that is generally recognized as being more adept at diagnosing and treating the condition of fibromyalgia").

Having established the physiological markers for fibromyalgia, Ms. Hill had to present "evidence that other disorders that could cause the symptoms . . . were excluded." SSR 12-2p, 2012 WL 3104869, at *2-3. She did. Ms. Hill's medical records show that her doctors ruled out multiple sclerosis (Doc. 9-12, p. 53), Lou Gehrig's (Doc. 9-15, p. 9), and myasthenia gravis (Doc. 9-12, p. 6; Doc. 9-15, pp. 97-

98) as the cause of Ms. Hill's fibromyalgia symptoms.  Dr. Counce evaluated Ms. Hill

for neuromuscular junction defect and found that Ms. Hill had no limitations and no

defects.  (Doc. 9-12, p. 6).  Dr. Collins indicated that there was no evidence of joint

inflammation or rheumatoid arthritis.  (Doc. 9-15, p. 85).  Dr. Allendorf opined that

because Ms. Hill continued to experience fatigue and other symptoms after correction

of her iron deficits, her symptoms were "unrelated to her iron/B12 status."  (Doc. 9-11,

p. 68; *see also* Doc. 9-10, p. 140).

To establish fibromyalgia as a medically determined impairment, Ms. Hill did

not have to rule out every conceivable impairment other  than fibromyalgia that might

cause symptoms of chronic pain and fatigue.  And Ms. Hill's unremarkable findings

concerning, for example, muscle strength and joint swelling are not inconsistent with

a fibromyalgia diagnosis. *Francis v. Saul*, 2020 WL 1227589, *3-4 (M.D. Fla. March

13, 2020) ("The ALJ's considerations of the objective evidence, however, do not

comport with the fact that physical examinations for person's with fibromyalgia will

usually yield normal results, *e.g.*, a full range of motion, no joint swelling, as well as

normal muscle strength and neurological reactions. . . . Undue emphasis on the lack of

objective findings to substantiate a claimant's fibromyalgia-related reports constitutes

error under well-established case law of this Circuit."); *Sosa v. Kijakazi*, 2022 WL

420755, *6 (Feb. 11, 2022) (same).  Accordingly, the ALJ's determination that Ms.

Hill failed to establish fibromyalgia as an MDI does not rest on substantial evidence,

and the ALJ erred in failing to consider fibromyalgia when assessing Ms. Hill's RFC. *See generally Moore v. Saul*, 2020 WL 1308404 (N.D. Ala. March 19, 2020).

There is another error in Ms. Hill's RFC.  The ALJ established an RFC for Ms. Hill which states that Ms. Hill "can frequently climb ramps and stairs; and she can frequently balance, stoop, kneel, crouch, or crawl.  The claimant has option to change posture from upright to seated, or vice versa, at her discretion, approximately every 30 minutes."  (Doc. 9-3, p. 27).  None of the above is consistent with Ms. Hill's medical records.  As the ALJ found, Ms. Hill has the severe impairments of dysautonomia and orthostatic hypotension.   (Doc. 9-3, p. 18).   Orthostatic hypotension or postural hypotension "is a form of low blood pressure that happens when standing after sitting or lying down. Orthostatic hypotension can cause dizziness or lightheadedness and possibly                          fainting."                     https://www.mayoclinic.org/diseases-conditions/orthostatichypotension/symptoms-causes/syc (last visited July 13, 2022). According to Ms. Hill's records of her visit with Dr. Phillips, her dysautonomia specialist, Ms. Hill experienced dizziness daily.  (Doc. 9-11, p. 125).  Dr. Phillips used a tilt-table test to evaluate Ms. Hill's dizziness. (Doc. 9-11, p. 125).  The tilt table test confirmed that Ms. Hill had POTS.  (Doc. 9-11, p. 125).  Like orthostatic hypotension, POTS "is a condition that affects blood flow. POTS causes the development of symptoms -- usually lightheadedness, fainting and an uncomfortable, rapid increase in heartbeat -- that come on when standing up from a reclining position and [are] relieved by sitting or lying back down."  https://my.clevelandclinic.org/health/diseases/16560-

postural-orthostatic-tachycardia-syndrome- (last visited July 13, 2022).  Ms. Hill's medical records reflect frequent falls.  (*See* Doc. 9-11, pp. 69, 78-79).  According to her functional assessment, Ms. Hill could climb stairs only occasionally "due to weakness of right hip flexion and bilateral knee extension, decreased range of motion of the lumbar spine and hips bilaterally as well as history of dysautonomia[,] POTS and fibromyalgia."  (Doc. 9-13, p. 74).  Consequently, Ms. Hill's RFC for "frequently climb[ing] ramps and stairs" and frequently balancing, stooping, kneeling, crouching or crawling is not supported by substantial evidence.  The ALJ's hypothetical questions to the VE incorporating these unsubstantiated exertional levels are in error too.  (*See* Doc. 9-5, p. 8); *Jones v. Apfel*, 190 F.3d 14, 1229 (11th Cir. 1999) ("to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments); *see Pendly v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985).

## Conclusion

For the reasons discussed above, the Court remands this case for further administrative proceedings consistent with this opinion.

**DONE** and **ORDERED** this July 15, 2022.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE